JAMES C. GULOTTA, Judge Pro Tem.
Murphy Anthony, Sr., individually and as tutor of his minor child, Murphy Anthony, Jr., instituted the present medical malpractice action against the State of Louisiana through the Department of Health and Human Resources, specifically Charity Hospital of Louisiana at New Orleans, and the attend *508 ing physicians who treated the child while hospitalized at Charity Hospital.
On January 16, 1980, Murphy Anthony, Jr., then three months of age, was admitted to Charity with a history of vomiting for a “couple” of days. The child was examined in the emergency room by a pediatric resident who determined that the child was suffering from a bowel obstruction. Whereupon, the pediatric surgery staff determined that an emergency surgical intervention was necessary to remove the obstruction. This surgery was performed at approximately 11:30 p.m. on the night of January 16, 1980. The senior pediatric surgery resident, Dr. Kelvin Contreary, performed the surgery and was assisted by Dr. Cedric Priebe, the supervising pediatric surgeon.
Following this initial surgery, at approximately 10:00 a.m. on January 17, the following day, the child commenced to exhibit complications. The child experienced periods where he would stop breathing. Observation and examination by Dr. Marcus Pittman, the pediatric surgery resident on duty, indicated that a heart murmur may have been the cause of the breathing problem. Oxygen was administered. However, because the child became lethargic the necessity of a blood gas study was indicated. The study revealed that the child was suffering from an excess of carbon dioxide in the blood. Whereupon the pediatric resident on duty, Dr. Ruthanne Gallagher, was called in and administered sodium bicarbonate to neutralize this excess. The child was also started on antibiotics.
The medical history indicated that the child had become dehydrated. Examination revealed that the child was not suffering from dehydration but rather was retaining fluids improperly. A diuretic was given to offset the retained excess fluids.
On the following day, January 18,1980, the pediatric surgeons noted seepage from the incision from the first surgery. A second surgery revealed that part of the child’s intestine and bowel had become gangrenous. According to the medical evidence, the spread of the gangrenous condition unfortunately invaded the lower right limb resulting in the amputation of the right lower leg.

IN LIMINE MOTIONS

Prior to trial, all defendants except the State of Louisiana, Dr. Cedric Priebe and Dr. Marcus Pittman were dismissed from the suit. In addition, plaintiff filed a motion in limine to exclude the deposition testimony of Dr. Priebe offered by the defendant. This motion was denied by the trial judge. At the commencement of the trial, the defendants noted their objection to the liability of the state being tried to a jury in violation of L.S.A.-R.S. 13:5105. The trial court informed counsel that it would not hear arguments on this issue as the matter should have been brought up by written motion prior to trial.
Following a protracted trial, the jury found no negligence on the part of the defendants. Whereupon the trial judge made the jury’s verdict the judgment of the court and dismissed plaintiffs claims. Thereafter, the trial judge, in response to the plaintiffs motion for judgment notwithstanding the verdict or alternatively a new trial, granted the new trial. The basis of the new trial grant was that the trial judge felt she erroneously allowed the introduction of the deposition of defendant Dr. Priebe in lieu of his testimony. Upon writ application to this Court, we reversed the trial court judgment granting a new trial, stating that
“[t]he trial court abused its discretion in granting a new trial based upon introduction of deposition testimony previously sanctioned and permitted by the trial judge in accordance with La.C.C.P. art. 1450. The correctness of the evidentiary rule can be raised on appeal.”
Plaintiff, appealing claims (1) it was error for the trial judge to permit the liability of the state to be tried to a jury; (2) it was error for the trial judge to permit the introduction of the deposition of Dr. Cedric Priebe into evidence on his own behalf; and (3) it was jury error in rendering a verdict contrary to the law and evidence.
L.S.A.-R.S. 13:5105 provides that “[n]o suit against the state or a state agency or political subdivision shall be tried by jury.” In Descant v. Rapides Parish Police Jury, 409 So.2d 1226 (La.1982), the Supreme *509 Court found that the language of the statute clearly precludes a trial by jury against the state, any state agency, or any political subdivision of the state. While acknowledging that the statute clearly prohibits a jury trial, this Court in Turner v. Regional Transit Authority, 498 So.2d 777 (La.App. 4th Cir.1986) declined to reverse a jury verdict against the political subdivision even though the trial court admittedly erred in denying the defendant’s motion to strike the jury order. The rationale for our holding was that the defendant state agency’s failure to appeal or seek supervisory writs of review from the trial court’s judgment constituted a waiver of its right to complain of the ruling. See also Row v. New Orleans Public Belt R.R., 539 So.2d 907 (La.App. 4th Cir.1989).
In Turner and also in Row we concluded that the party against whom the trial judge ruled on the jury or judge trial question was guilty of a waiver- of their rights. However, unlike Turner and Row, in the instant case, plaintiff sought the jury trial. The trial judge ruled in plaintiffs favor on the jury trial question. With a favorable ruling by the trial judge, plaintiff had no interest or desire nor was it incumbent upon the plaintiff to complain to a reviewing court of the favorable ruling. Therefore, the rationale on waiver of rights in Turner and Row is not applicable to our plaintiff. On the morning of the trial, when defense counsel objected to having the jury determine the state’s liability, understandable, plaintiff did not join in defendants’ objection. The plaintiff had no obligation to object. Accordingly, we find no waiver by plaintiff of his right to have this court consider the jury/trial judge question.
As hereinbefore pointed out, the Louisiana Supreme Court in Descant has stated that the statute clearly precludes a trial by jury against the state, any state agency or any political subdivision of the state. Following Descant, we conclude the trial judge erred when she allowed the jury to determine Charity Hospital’s liability. Accordingly, we conclude further that the error in the instant case is reversible. Accordingly, we are compelled to reverse and set aside the jury verdict in so far as it determined the question of Charity Hospital’s Lability and remand the matter to the trial judge to conduct a bench trial on that institution’s liability-

DEPOSITION

Plaintiff’s next assignment of error is that the trial judge erred in allowing defense counsel to introduce Dr. Cedric Priebe’s deposition into evidence. At the time of the trial, Dr. Priebe had been residing and practicing medicine in Stonybrook, New York for 8 years. Plaintiffs counsel had notice of and actively participated in the deposition. During the taking of the deposition Dr. Priebe informed both plaintiff and defense counsel that it would be a considerable hardship for him to attend a week long trial in New Orleans. Further, there is no claim that either party was prejudiced by a failure to question this witness in deposition. The issue now presented to this Court is whether a litigant whose deposition is taken and who chooses not to be present at the trial can be guilty of procuring his absence, making the deposition inadmissible. Dr. Priebe testified that his medical commitments in New York would constitute a hardship if he were required to be in New Orleans for the trial. Plaintiff introduced no evidence to support a claim that Dr. Priebe procured his own absence within the intent and meaning of LAC.C.P. 1450.[1] Furthermore, the trial court had no jurisdiction to issue a subpoena to Dr. *510 Priebe as he lives outside of the jurisdiction of the court.
When we consider the statute together with the evidence relating to the taking and use of the deposition, we can not say the trial judge erred in allowing Dr. Priebe’s deposition to be introduced into evidence. As this Court noted in Joseph v. Gibliant, 590 So.2d 841, 843 (La.App. 4th Cir.1991), “ ‘live’ testimony would have been more, not less, influential on- the jury and consequently more helpful to defendant’s not plaintiffs case.” Under these circumstances, we do not find that plaintiff suffered any prejudice by the use of the deposition.

SUFFICIENCY OF EVIDENCE

Finally, plaintiff argues that the jury’s verdict dismissing his claims against the defendants is not supported by the law and evidence.
In a medical malpractice action against a physician, a plaintiff carries a twofold burden of proof. The plaintiff must establish by a preponderance of the evidence that the doctor’s treatment fell below the ordinary standard of care required of physicians in his medical specialty, and also must establish a causal relationship between the alleged negligent treatment and the injury sustained. L.S.A.-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Smith v. State through DHHR, 523 So.2d 815 (La.1988). Resolution of each of these inquiries are determinations of fact which will not be reversed on appeal absent manifest error. Where there are two permissible views of the evidence, the factfin-der’s choice between them cannot be the basis of a manifestly erroneous holding. Housley v. Cerise, 579 So.2d 973 (La.1991).
In the instant case, plaintiff alleges that the amputation of the child’s leg resulted from the impact of several stresses on the child’s body, namely, infection, lower body temperature, acidosis, and dehydration. Plaintiffs expert, Dr. Rowena Spencer, testified that it was the defendants’ negligence in attending and treating the child which allowed the stresses to exist and place a strain on the child. However, defendants’ experts stated that the physicians treated the child in accordance with the accepted and proper standard of care. Dr. William Hardin, a pediatric surgeon, testified that it appeared the underlying infection caused the disseminated intravascular coagulation (DIC) which in turned resulted in the amputation of the child’s lower leg.

INFECTION

According to the medical testimony in the record, DIC or disseminated intravascular coagulation occurs when platelets in the blood form collections and cause tiny blood clots throughout the blood stream. Dr. Priebe stated that this condition is usually associated with severe infection. Dr. Hardin testified that the gangrenous condition of the bowel, which necessitated the second surgery, was probably caused by the disseminated intravascular coagulation of the blood. He was of the opinion that this condition was caused by stress on the child resulting from the underlying infection. Significantly, Dr. Hardin stated that the physicians treated the child within the proper standard of care and responded appropriately as complications arose.
Dr. Spencer, plaintiffs medical expert, found fault with the failure of the medical staff to administer antibiotics after the first surgery. According to Dr. Spencer, the procedure used by the hospital medical staff to release gas and fluid from the child’s bowel could very well have contributed to contamination in the blood stream.
However, Dr. Contreary and Dr. Priebe disputed the existence of contamination after the first surgery. The doctors stated that during the entire surgery, the child’s abdominal area was continually bathed with warm saline which would have washed out any such contaminants. In addition, defendants’ expert, Dr. Hardin, stated that the procedure performed by Drs. Contreary and Priebe did not require the institution of antibiotics. Furthermore, blood tests taken after the surgery did not reveal any bacterial infection in the blood. Additional blood work performed at 5:00 p.m. on January 17th did not indicate any bacterial infection. Nonetheless, despite *511 these test results, the child was started on antibiotics on the evening of January 17th.

LOWER BODY TEMPERATURE

' Plaintiffs expert, Dr. Spencer, stated that the child was not kept properly warm during tests performed on the child after admittance in the emergency room.
The child’s temperature prior to surgery at 11:30 p.m. was 93 degrees. During surgery, the child was warmed and a near normal temperature was obtained. However, the day after surgery the child’s temperature again decreased although he was wrapped in a blanket and kept in an isolette (described by Dr. Pittman as a closed environment.) Defendants’ experts testified that the child’s underlying infection could have caused the low temperature. While the defense experts acknowledged that abnormally low body temperature can place stress on one undergoing surgery, they stated that this lower temperature cannot cause or contribute to disseminated intravascular coagulation of the blood.

ACIDOSIS

Plaintiff contends that Dr. Pittman was negligent in the diagnosis and treatment of the child’s acidosis (excess of carbon dioxide in the blood). Specifically, plaintiff argues that Dr. Pittman negligently waited until the afternoon of January 17th (approximately twelve hours post surgery) to order a blood gases study to determine the child’s acid level.
The medical records indicate that the child began having breathing problems around 9:00 a.m. on January 17th. Dr. Pittman testified that he thought the child may have been having a reaction to the anesthesia from surgery. Concerned with the child’s irregular heartbeat and breathing, Dr. Pittman ordered an EKG to rule out any underlying cardiac problems. At this time, the child’s overall condition was good. According to Dr. Pittman, the EKG revealed a heart murmur which could have been an underlying cause of the breathing problem. After the child experienced two additional breathing problem episodes (at 11:30 a.m. and 2:00 p.m.), Dr. Pittman ordered an arterial blood gas study. In addition, a pediatric resident, Dr. Ruthanne Gallagher was consulted. When the blood gas analysis revealed a high level of carbon dioxide in the blood, Dr. Pittman ordered that oxygen be administered to the child.
Dr. Gallagher administered sodium bicarbonate. She testified that irregular breathing episodes are not unusual in infants. According to Dr. Gallagher, these episodes may occur in children up to six months of age. Dr. Gallagher also stated that the child’s breathing problems contributed to the high acid level and excess carbon dioxide in the blood.

DEHYDRATION

The history given by the child’s parents when he was admitted to the emergency room indicated that he had been vomiting for a “couple” of days. However, tests initially performed in the emergency room revealed that the child’s hydration status was normal. Out of caution, the physicians placed the child on intravenous fluids. The child was maintained on intravenous fluids during and after the first surgery. All tests and indications initially revealed that the child’s hydration level was normal. However, on the afternoon following the early morning surgery the child appeared to be dehydrated. According to the medical evidence, fluids were administered to counteract the apparent dehydration. Dr. Gallagher stated that, because of a hormonal disorder, the child was actually retaining fluids. She stated further that the child was properly administered a diuretic. This expert testified that this condition can cause a person to appear to be dehydrated when in fact the person’s hydra-tional level is normal or above normal. Dr. Gallagher further stated that the child’s underlying infection could have made the child susceptible to this condition.
When all of the medical evidence is considered, it is clear that the jury was confronted with conflicting medical opinions on the question of the standard of care exercised by the physicians involved in Murphy Anthony Jr.’s care and treatment. The jury chose to accept the medical evidence supporting a conclusion that the defendants-physicians had not acted below the accepted standard of care. We can not say the jury, based on its *512 credibility determination, was manifestly erroneous. We cannot substitute our judgment for that of the jury.
Accordingly, we affirm that part of the judgment dismissing plaintiffs suit against the physicians. We reverse and set aside that part of the judgment dismissing the suit against Charity Hospital of Louisiana at New Orleans and the State of Louisiana and remand this matter to the trial court for further proceedings not inconsistent with the views express herein.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
BARRY, J., dissents in part.

. Code of Civil Procedure article 1450 states that
A. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions: ...
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
(a) That the witness is unavailable;
(b) That the witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition